# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jason P. P.,                                          Case No. 20-cv-688 (TNL)

      Plaintiff,

v.                                                          **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

      Defendant.

Jason P. P., 2300 Horizon Place, Burnsville, MN 55337 (pro se Plaintiff); and

Elvi Jenkins, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Pro se Plaintiff Jason P. P. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 22, 23. For the reasons set forth below, Plaintiff's motion is denied and the Commissioner's motion is granted.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in 2017, asserting that he has been disabled since February 2016 due to: "Cardiac Myopathy[,] Chronic systolic congestive heart failure[,] Anxiety[,] Depression[,] Bipolar [disorder,] Coronary artery disease[,] Acute myocardial infarction of anterior wall[,] Mitral regurgitation pulmonary hypertension[, and] Cardiomyopathy, ischemic EF 20-25%." Tr. 23, 87-88, 102-03. Plaintiff's application was denied initially and again upon reconsideration. Tr. 23, 99, 101, 116, 117. Plaintiff appealed the reconsideration of the DIB determination by requesting a hearing before an administrative law judge ("ALJ"). Tr. 23, 134-35.

The ALJ held a hearing on January 11, 2019. Tr. 23, 50. Plaintiff was represented by counsel during the hearing. Tr. 23, 50. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review. Tr. 3-5, 183-86. Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 22, 23. This matter is now fully briefed and ready for a determination on the papers.

## III. ANALYSIS

### A.  Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Construing Plaintiff's submissions liberally in light of his pro se status, Plaintiff primarily asserts that the ALJ erred in concluding that he did not equal Listing 4.02 for chronic heart failure and in determining his residual functional capacity.

### B. Step 3: Meets or Equals a Listed Impairment

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson v. Astrue*, 604 F.3d

589, 592 (8th Cir. 2010) (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

"An impairment meets a listing only if it 'meet[s] all of the specified medical criteria.'" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) (alteration in original) (quoting *Sullivan*, 493 U.S. at 530). "An impairment is medically equivalent under the regulations if it is 'at least equal in severity and duration to the criteria of any listed impairment.'" *Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)); *accord* 20 C.F.R. § 404.1526(a). "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Carlson*, 604 F.3d at 594 (quoting *Sullivan*, 493 U.S. at 531). "The claimant has the burden of proving that his impairment meets or equals a listing." *Id.* at 593.

### 1. Medical Records

Plaintiff has a history of heart conditions, including a heart attack in 2012,[2] ischemic cardiomyopathy,[3] and coronary artery disease. *See, e.g.*, Tr. 399-415, 417, 411-

---

[2] Plaintiff suffered "a large anterior myocardial infarct[ion]." Tr. 380. A myocardial infarction is colloquially known as a heart attack. *Heart Attack*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/heartattack.html (last accessed Sept. 17, 2021).

[3] "Cardiomyopathy is disease of abnormal heart muscle in which the heart muscle becomes weakened, stretched, or has another structural problem. It often contributes to the heart's inability to pump or function well." *Cardiomyopathy*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/ency/article/001105.htm (last accessed Sept. 17, 2021). "Many people with cardiomyopathy have heart failure." *Id.* "Ischemic cardiomyopathy

412, 407-08, 403-04. Plaintiff subsequently had an automatic cardioverter/defibrillator with a pacemaker implanted. *See, e.g.*, Tr. 57, 415. Plaintiff's past echocardiograms have shown an ejection fraction of 25 to 30%.[4] Tr. 417, 406, 403-04.

**a. 2016**

Towards the end of January 2016, Plaintiff reported having chest pain and increased fatigue. Tr. 399. Plaintiff reported he was "under a lot of stress at work." Tr. 399.

Plaintiff was seen by Karl William Foster-Smith, MD, in early February. Tr. 394-98. Plaintiff reported increased job stress as there were currently only two people performing a job that four people used to do. Tr. 394. Dr. Foster-Smith noted that Plaintiff "does get some shortness of breath on exertion, but he can walk maybe 2 miles on a treadmill. It is as if he walks through the shortness of breath." Tr. 394. Plaintiff did not have orthopnea, paroxysmal nocturnal dyspnea, or ankle edema.[5] Tr. 394. Plaintiff reported "occasional twinges of discomfort which last a second or [two]," which was "entirely different from the discomfort he had at the time of his myocardial infarct, which is a more pressure sensation associated with nausea." Tr. 394. Plaintiff also reported experiencing a "fullness in his chest" when stressed. Tr. 394. Dr. Foster-Smith placed

---

is caused by a narrowing of the arteries that supply the heart with blood. It makes the heart walls thin so they do not pump well." *Id.*

[4] "Heart failure can be diagnosed if the echocardiogram shows that the pumping function of the heart is too low. This is called an ejection fraction. A normal ejection fraction is around 55% to 65%." *Heart failure – tests*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/ency/patientinstructions/000366 htm (last accessed Sept. 17, 2021).

[5] When discussing evaluation of chronic heart failure, the listings note that "[s]ymptoms of congestion or of limited cardiac output include easy fatigue, weakness, shortness of breath (dyspnea), cough, or chest discomfort at rest or with activity. Individuals with [chronic heart failure] may also experience shortness of breath on lying flat (orthopnea) or episodes of shortness of breath that wake them from sleep (paroxysmal nocturnal dyspnea)." 20 C.F.R. Pt. 404, subpt. P, 4.00.D.2.b.i. Peripheral edema is also a sign of congestion. *Id.* 4.00.D.2.b.ii.

Plaintiff's ejection fraction "in the 25% range." Tr. 394; *see* Tr. 380 ("EF in the 20-25% range"). Dr. Foster-Smith also noted that Plaintiff's "[l]ast nuclear stress testing was a year ago, which showed no evidence of ischemia and a large LAD territorial myocardial infarct." Tr. 394. Among other things, Dr. Foster-Smith adjusted Plaintiff's medications, including increasing Lasix[6] and spironolactone.[7] Tr. 394.

Plaintiff was also followed in the C.O.R.E. Clinic, "an outpatient disease management program to help patients with heart failure or cardiomyopathy manage their illness." *C.O.R.E. Clinic for Heart Failure Management*, M Health Fairview, https://www.mhealthfairview.org/treatments/CORE-Clinic-for-Heart-Failure-Management (last accessed Sept. 17, 2021). On February 18, Plaintiff met with Kristine A. Mannchen, APRN, CNP. Tr. 386. Mannchen noted that Plaintiff "just recently joined a gym" and was going "[two to three] times per week." Tr. 388. Mannchen reduced the Lasix due to Plaintiff's "serum sodium" level and "asked [Plaintiff] to repeat a basic metabolic panel in [two] weeks and then again prior to his [next] visit with Dr. Foster-Smith." Tr. 390.

Dr. Foster-Smith next saw Plaintiff in mid-March. Tr. 380. Dr. Foster-Smith placed Plaintiff "in class II or class III heart failure."[8] Tr. 380. Dr. Foster-Smith opined

---

[6] Lasix is a brand name for furosemide, which "is used alone or in combination with other medications to treat high blood pressure" and "edema (fluid retention; excess fluid held in body tissues) caused by various medical problems, including heart, kidney, and liver disease." *Furosemide*, MedlinePlus, U.S. Nat'l Lib. of Med., https:// medlineplus.gov/druginfo/meds/a682858 html (last accessed Sept. 17, 2021).

[7] Spironolactone is used, among other things, in the treatment of heart failure. *Spironolactone*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682627.html (last accessed Sept. 17, 2021).

[8] The New York Heart Association Functional Classification classifies heart failure "based on how much [a patient is] limited during physical activity." *Classes of Heart Failure*, Am. Heart Ass'n, https://www.heart.org/en/ health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last accessed Sept. 17, 2021). There are four classes. *Id.* Class I patients have "[n]o limitation of physical activity" and "[o]rdinary physical activity does

that "certain changes will need to be made" based on Plaintiff's "significant symptomatology and []his profound fatigue." Tr. 380-81. Dr. Foster-Smith discontinued lisinopril[9] and switched Plaintiff to Entresto.[10] Dr. Foster-Smith additionally prescribed Corlanor.[11] Tr. 381. Dr. Foster-Smith also directed Plaintiff to "follow up with the electrophysiologist to see if we can upgrade his [automatic cardioverter/defibrillator] to a biventricular pacemaker." Tr. 381. Dr. Foster-Smith directed Plaintiff to follow up with the C.O.R.E. clinic in two weeks for medication adjustments. Tr. 381.

Towards the end of March, Plaintiff saw Quan V. Pham, MD, in connection with possibly upgrading his heart device. Tr. 374-78. Dr. Pham noted that, "[s]ince asking to be off from work, [Plaintiff] felt much better and [has been] able to do as much as he

---

not cause undue fatigue, palpitation, dyspnea (shortness of breath)." *Id.* Class II patients have "[s]light limitation of physical activity." *Id.* They are "[c]omfortable at rest" and "[o]rdinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath)." *Id.* Class III patients have "[m]arked limitation of physical activity." *Id.* While they are "[c]omfortable at rest," "[l]ess than ordinary activity causes fatigue, palpitation, or dyspnea." *Id.* Class IV patients are "[u]nable to carry on any physical activity without discomfort" and experience "[s]ymptoms of heart failure at rest. If any physical activity is undertaken, discomfort increases." *Id.*

[9] Lisinopril is used to treat high blood pressure as well as "in combination with other medications to treat heart failure." *Lisinopril*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a692051 html (last accessed Sept. 17, 2021). "It works by decreasing certain chemicals that tighten the blood vessels, so blood flows more smoothly and the heart can pump blood more efficiently." *Id.*

[10] Entresto is a brand name for "[t]he combination of valsartan and sacubitril [and] is usually used in combination with other medications to lower the risk of death and hospitalization in adults with certain types of heart failure." *Valsartan & Sacubitril*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a615039 html (last accessed Sept. 17, 2021).

> Valsartan is in a class of medications called angiotensin II receptor antagonists. It works by blocking the action of certain natural substances that tighten the blood vessels, allowing the blood to flow more smoothly and the heart to pump more efficiently. Sacubitril is in a class of medications called neprilysin inhibitors. It works to help control blood volume.

*Id.*

[11] Corlanor is a brand name for ivabradine and "is used to treat certain adults with heart failure (condition in which the heart is unable to pump enough blood to the other parts of the body) to decrease the risk that their condition will worsen and need to be treated in a hospital." *Ivabradine*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a615027.html (last accessed Sept. 17, 2021). "It works by slowing the heart rate so the heart can pump more blood through the body each time it beats." *Id.*

wants.  He can climb stairs without any problem.  He can 'walk for miles.'  He is looking forward to seeing [t]he Wild playing tonight with his wife and son."  Tr. 378.  Dr. Pham additionally noted that

> [i]t is unclear whether the new medication or the fact that the patient's stress level has been greatly reduced from his work is helping him to feel much better.  He is probably New York Class I-II right now, and I cannot guarantee him that upgrading his device will make him feel any better than what it is right now.

Tr. 378.  Dr. Pham encouraged Plaintiff "to continue his current medical therapy and exercise as much as he can."  Tr. 378.

Approximately one week later, at his next appointment with Mannchen, Plaintiff reported "feel[ing] great."  Tr. 374.  Plaintiff had no increased shortness of breath, paroxysmal nocturnal dyspnea, "syncope or near-syncope."  Tr. 374.  He also had no "chest pain, chest pressure, neck or arm pain."  Tr. 374.  Mannchen again adjusted the Lasix.  Tr. 374.

Plaintiff saw Mannchen again at the end of April.  Tr. 369.  Plaintiff was noted to be "doing quite well" and his "symptoms continue[d] to be minimal."  Tr. 369.  There was some confusion by Plaintiff with his medications. Tr. 369.  Mannchen "explained to [Plaintiff] that it is imperative to take these lifesaving medications" and encouraged him to have his wife call the C.O.R.E. clinic "to make sure . . . [he] is receiving the medications as directed" as Plaintiff's wife generally set up his medications for him.  Tr. 369.  Congestive heart failure was included among Plaintiff's diagnoses.  Tr. 369.

Plaintiff's next appointment with Dr. Foster-Smith was at the end of June.   Tr. 349.   Dr. Foster-Smith noted that Plaintiff was doing "much better [symptomatically] on Corlanor and Entresto."   Tr. 349.   Dr. Foster-Smith directed Plaintiff to follow up with Mannchen in the C.O.R.E. clinic in two months and to follow up with him in six months. Tr. 349.

Around mid-July, Plaintiff was admitted to the emergency room for symptoms of psychosis.   Plaintiff was agitated and "presented as paranoid with impaired insight and judgment."   Tr. 344.   Plaintiff had also stopped taking both his psychiatric and heart medications.    Tr. 344.    Plaintiff was admitted, placed on a 72-hour hold, and subsequently discharged at the end of hold.   *See* Tr. 325-43.

### b.  2017

Plaintiff saw Dr. Foster-Smith again towards the end of January 2017.   Tr. 290. The echocardiogram showed Plaintiff's ejection fraction to be 20 to 25%.   Tr. 290.   Dr. Foster-Smith noted that Plaintiff "feels well.   He does not have shortness of breath.   He can walk approximately a mile before he has to stop because of fatigue, and this is probably due to his decreased cardiac output.   However, he is not complaining of ankle edema.   He is not complaining of orthopnea."   Tr. 290.   Dr. Foster-Smith rated Plaintiff at "stage II heart failure."   Tr. 290.   Dr. Foster-Smith recommended that the Entresto dose be increased.   Tr. 290.   He also recommended that Plaintiff follow up with Mannchen in one month at which time the Lasix dose would be evaluated.   Tr. 290.

Plaintiff met with Mannchen in early March.   Tr. 288.   Plaintiff reported "increased dizziness and near-fainting on occasion since he increased his medication."

Tr. 288.  Mannchen directed Plaintiff to follow up in one month for reassessment, which he did.  Tr. 289, 281.

Plaintiff saw Dr. Foster-Smith again near the end of April.  Tr. 492.  Based on Plaintiff's reports of "near-syncopal episodes and dizziness, most likely because his blood pressure was too low," Dr. Foster-Smith reduced Plaintiff's Entresto dose back to where it had been.  Tr. 492.  Dr. Foster-Smith also noted the presence of "raised filling pressures and moderate pulmonary hypertension."  Tr. 492.  Dr. Foster-Smith increased the Lasix dose, and directed Plaintiff to follow up with him in six months and Mannchen in two months.  Tr. 493.  Dr. Foster-Smith noted that Plaintiff's "[h]istory of mental and psychiatric issues . . . will adversely affect the treatment of his congestive heart failure which of course requires a large amount of discipline with respect to medications, diet and avoidance of salt."  Tr. 492.

Plaintiff met with Mannchen in mid-July.  Tr. 505.  With the change in medication, Plaintiff reported "no lightheadedness or dizziness."  Tr. 506.  Mannchen noted that Plaintiff "feels well."  Tr. 506.  Plaintiff continued to have no complaints of orthopnea, paroxysmal nocturnal dyspnea, or ankle edema.  Tr. 506.  Mannchen described Plaintiff as "doing great" and made no changes to his medications.  Tr. 506.

### c.  Post-July 2017

The record does not contain any medical records from Dr. Foster-Smith or Mannchen after July 2017.  *See generally* Tr. 507-87.  There is a reference to an upcoming appointment with Dr. Foster-Smith in October 2017, Tr. 517, but there are no records from this appointment or any indication that the appointment occurred.  There

are, in fact, no records specifically related to the treatment of Plaintiff's heart conditions after July 2017.

Notes from a June 2018 visit to establish care state that an "echo" taken at the end of January 2018 showed "[n]o significant change since 1/26/2017."  Tr. 559.  They also refer to an upcoming "appt on July 10th" with Dr. Foster-Smith for a "repeat echo."  Tr. 560.

### 2.  Hearing Testimony

At the hearing, Plaintiff testified that he left his job in February 2016 because he "fe[lt] like [he] was going to die," Tr. 62, and was concerned that the stress he was experiencing "wasn't good for [his] heart" and causing "chest pains," Tr. 75.

Plaintiff testified that his heart conditions are a series of "continuous ups and downs."  Tr. 64.  Plaintiff testified that he experiences shortness of breath, fatigue, and "constant worry about [his] heart symptoms."  Tr. 64.  Plaintiff described the worry as being "scared" and feeling like he is stressed.  Tr. 64.

Plaintiff testified that he walks to a nearby park within a block from his home.  Tr. 58, 77.  Depending on the day, Plaintiff can have difficulties with the walk, including shortness of breath and the stress of worrying if he is doing too much.  Tr. 58, 77.  When asked by the ALJ regarding statements Plaintiff made to his treatment providers about not having shortness of breath, Plaintiff explained that "shortness of breath is part of [his] condition" and "the questions are usually [is he] having too much shortness of breath where . . . [he has] to, like, some further action immediately or something."  Tr. 78.  Plaintiff additionally testified that he cannot "exercise for extended periods of time,"

describing it as "a gray area," where he really does not know how much exercise he can and cannot do.  Tr. 65.  Plaintiff testified that he has been advised by his doctor not to go to the point of exertion, "[t]ry to do what you can before you feel it."  Tr. 65-66.

Plaintiff further testified that he "do[es] pretty much anything for [his] sons, that [his] sons require."  Tr. 72.  Although he was restricted from driving for a period of time after his heart device had gone off, he typically drives almost every day, transporting his son to athletic events/meets and going to the grocery store.  Tr. 55-56; *see* Tr. 73. Plaintiff did testify that there have been "multiple times" when he was not able to drive his sons as planned and he needed to call relatives or his wife to take them.  Tr. 78-79. Plaintiff stated this occurred went his heart device went off or if he was "feel[ing] not mentally stable."  Tr. 79.  Additionally, Plaintiff testified that he does chores around the house, except for laundry, mowing the lawn, and trimming trees.  Tr. 73-74.  Plaintiff and his sons attended church and tried to have family dinners when possible.  Tr. 73.

### 3.  Listing 4.02

Listing 4.02 addresses chronic heart failure.  *See generally* 20 C.F.R. pt. 404, subpt. P, 4.02.  To meet or equal Listing 4.02, both the A and B criteria must be satisfied. *Id.*  There is no dispute that Plaintiff's ejection fraction of 20 to 25% meets the A criteria. *See* 20 C.F.R. pt. 404, subpt. P, 4.02.A.  The ALJ found so as well.  Tr. 27.

In addition to the A criteria, there must also be one of the following B criteria:

> 1. Persistent symptoms of heart failure which very seriously
> limit the ability to independently initiate, sustain, or complete
> activities of daily living in an individual for whom [a medical

consultant[12]], preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. pt. 404, subpt. P, 4.02.B.

### a. ALJ's Decision

The ALJ concluded that

---

[12] "A medical consultant is a member of a team that makes disability determinations in a State agency (see § 404.1615), or who is a member of a team that makes disability determinations for us when we make disability determinations ourselves." 20 C.F.R. § 404.1616(a); *see* 20 C.F.R. pt. 404, subpt. P, 4.00.A.3.a (defining medical consultant). "The medical consultant completes the medical portion of the case review and any applicable residual functional capacity assessment about all physical impairment(s) in a claim." 20 C.F.R. § 404.1616(a). The regulations "use the abbreviation 'MC' throughout [section 4.00] to designate a medical consultant." 20 C.F.R. pt. 404, subpt. P, 4.00.A.3.a.

> [w]hile Plaintiff has an ejection fraction of 20-25%, consistent with meeting the criteria of listing 4.02(A), he does *not* have persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living, nor three or more episodes of acute heart failure during a consecutive 12-month period. Further, there is no evidence of inability to perform an exercise tolerance test.

Tr. 27.  The ALJ explained that

> [a]t the beginning of the relevant time period, [Plaintiff's] treating provider indicated [he] would have been class II or III, consistent with more moderate symptoms and marked degree of physical restriction.  However, within five months, treating provider notes indicated [Plaintiff] has class I to II (New York Heart Association) symptoms, which are consistent with *mild* symptoms and slight limitation of physical activity.

Tr. 27 (citation omitted).   The ALJ noted that the findings in the medical records "indicate [Plaintiff] reported he was feeling well, denied shortness of breath, and indicated he could walk one mile before having to stop due to fatigue, with normal blood pressure findings."   Tr. 27.   The ALJ additionally noted that "[i]n July 2017, . . . Mannchen indicated [Plaintiff] continued 'doing great.'"   Tr. 27.   Plaintiff "reported no ongoing lightheadedness or dizziness, and reported feeling well as noted."   Tr. 27.   The ALJ therefore concluded that "the record does not establish the severity of limitation required to meet listing 4.02."   Tr. 27.

### b.  Parties' Arguments

Plaintiff argues that the ALJ erred by concluding he did not equal Listing 4.02 by way of the B.1 criteria.   Plaintiff asserts that he "self[-]limit[s] and monitor[s his] activities so [he has] no amount of stress that might cause persistent heart failure," Pl.'s

Mem. at 2, ECF No. 22, and is not able to perform "a regular stress test, only [a] nuclear [stress test]," Compl. at 2; *see* Ltr. to ALJ at 2, ECF No. 22-1.

In support of the presence of "[p]ersistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living," 20 C.F.R. pt. 404, subpt. P, 4.02.B.1, Plaintiff points to his testimony at the hearing as evidence that he self-limits and monitors his activities so as not to exacerbate the symptoms of his heart conditions. Respectfully, the Court does not necessarily agree with Plaintiff's characterization of his testimony, which, in this Court's view, seemed to speak more to the good days and bad days/ups and downs of Plaintiff's conditions, rather than self-imposed limits per se. Regardless, the ALJ correctly pointed to evidence in the record demonstrating that Plaintiff was not seriously limited in his ability to initiate, sustain, or complete activities of daily living.

The ALJ noted that, within a period of five months, Plaintiff went from having "class II or III" symptoms, which are "consistent with more moderate symptoms and marked degree of physical restriction," to "class I or II" symptoms, "which are consist with mild symptoms and slight limitation of physical activity." Tr. 27 (emphasis omitted). The ALJ also noted Plaintiff's reports of feeling well and being able to "walk one mile before having to stop due to fatigue," and no complaints of shortness of breath, dizziness, or lightheadedness. Tr. 27. Elsewhere, the ALJ noted that Plaintiff joined a gym, is generally able to perform his own personal care, takes care of his two sons, prepares simple meals, cares for the dog, cleans, performs minor household repairs, tidies up the yard, walks, drives, and shops in stores. Tr. 29; *see* Tr. 33, 37. Additionally, on

initial review, the state agency medical consultant noted that Plaintiff was "relatively asymptomatic despite [his] low [ejection fraction]." Tr. 96.

In *KKC*, the claimant had an ejection fraction of 20%, which subsequently dropped to 10%. 818 F.3d at 366. Like Plaintiff, the claimant also "had a defibrillator implanted." *Id.* It was similarly argued that the claimant met Listing 4.02 through the B.1 criteria. *Id.* at 370. The Eighth Circuit Court of Appeals held that substantial evidence supported the conclusion that the claimant's chronic heart failure did not meet Listing 4.02, reasoning:

> KKC cites evidence that Carter was limited in his ability to perform activities of daily living, but the record likewise includes evidence that Carter was able to complete such activities. Carter was able to drive, shop for groceries, and play video games and cards. He could take care of himself, look after his children, and help care for pets. Although housework caused Carter to become fatigued, he was able to prepare simple meals, vacuum, wash dishes, do laundry, take out the trash, and pick up toys.

*Id.*

Based on Plaintiff's daily activities, there is substantial evidence in the record to support the ALJ's conclusion that the symptoms of Plaintiff's chronic heart failure did not "very seriously limit [his] ability to independently initiate, sustain, or complete activities of daily living." 20 C.F.R. pt. 404, subpt. P, 4.02.B.1; *see KKC*, 818 F.3d at 370; *see also, e.g.*, *Morris v. Colvin*, No. 6:14-cv-6056, 2015 WL 4464123, at *3 (W.D. Ark. July 21, 2015) (Listing 4.02 not met with ejection fraction of 20% where claimant "testified she attends physical therapy, takes care of chores around the house, and can comp[l]ete activities such as grocery shopping and cooking"); *Sheffield v. Colvin*, No.

17

6:13-cv-06093, 2014 WL 3896192, at *4-5 (W.D. Ark. Aug. 8, 2014) (Listing 4.02 not met with ejection fraction of 30% where claimant "could engage in physical activities such as running, elliptical training, and abdominal crunches; and could perform activities of daily living such as doing light household chores, washing clothes, driving a car, shopping in stores, and attempting to care for his disabled wife"); *Emrick v. Astrue*, No. 4:11-cv-04046, 2012 WL 1686412, at *4 (W.D. Ark. May 5, 2012) (Listing 4.02 not met with ejection fraction of 30% where claimant "testified she was able to perform nearly all of her household chores[, including sweeping, mopping, cooking, doing laundry, and doing yard work], and was able to care for her seventeen-year-old child" and "stated she took care of her dog and cat, had no problem taking care of her personal needs, was able to go outside 2 to 3 times a day, was able to go grocery shopping, and was able to go to church").

The Court recognizes that Plaintiff's argument is one of medical equivalence. As the Commissioner correctly points out, "medical equivalence must be based on medical findings." Comm'r's Mem. at 9 (quotation omitted), ECF No. 24. *See* 20 C.F.R. § 404.1526(b)(1)(ii) ("We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria."), (c) (evidence considered); *see also Carlson*, 604 F.3d at 594. Here, Plaintiff relies on his own testimony, rather than pointing to medical evidence in the record to support his assertion that his chronic heart failure equals Listing 4.02. Indeed, the state agency medical consultants, whose opinions the ALJ was required to take into account, opined that Plaintiff's chronic heart failure,

although severe, did not meet or equal Listing 4.02.  Tr. 91, 95-96, 107, 110-11.  *See* 20

C.F.R. § 404.1526(c) ("We also consider the opinion given by one or more medical or

psychological consultants designated by the Commissioner.  (See § 404.1616.).");  *Jones*

*ex rel. Morris v. Barnhart*, 315 F.3d 974, 978 & n.2 (8th Cir. 2003).  Plaintiff "has not

directed [the Court's] attention to any medical opinion that states that [his] condition met

or equaled" Listing 4.02.  *Jones*, 315 F.3d at 978.

      With respect to the performance of an exercise test, Plaintiff asserts that

> my stress test appointments are actually noted as NM MPI
> STRESS TEST LEXISCAN which means I am given an
> injection to determine results versus performing a physical
> stress test.  My CORE nurse Kris Mannchen wanted me to
> share that this test is entirely different and more significant in
> comparing the procedures.  In reaching [his] decision [the
> ALJ] concluded that "performance of an exercise test would
> not cause a significant risk to me" however this is untrue and
> evidenced in my chart.

Ltr. to ALJ at 2; *see* Tr. 394 (2016 treatment note that nuclear stress testing performed a

year ago).  While the medical evidence reflects that Plaintiff underwent a nuclear stress

test in 2015, the ALJ correctly concluded that there was no evidence in the record of

Plaintiff's "inability to perform an exercise tolerance test."  Tr. 27.  Neither medical

consultant, on initial review or reconsideration, concluded that the performance of an

exercise test would present a significant risk to Plaintiff.  Tr. 95-96, 110-11.  *See* 20

C.F.R. pt. 404, subpt. P, 4.02.B.1; *KKC*, 818 F.3d at 370 ("The record also is devoid of

any evidence that a medical consultant had concluded that an exercise test would have

presented a significant risk to Carter."); *see also, e.g.*, *Dew v. Comm'r of Soc. Sec.*, No.

15-CV-12660, 2017 WL 744238, at *4 (E.D. Mich. Feb. 27, 2017); *Clark v. Astrue*, No.

C09-0176, 2011 WL 570241, at *8 (N.D. Ia. Feb. 14, 2011); *cf. Gunter v. Astrue*, No. 3:09CV0292, 2010 WL 3293567, at *8 (S.D. Ohio June 28, 2010) (state agency medical consultant "explicitly found that [claimant] has numerous conditions which preclude ordering a GXT for disability purposes" (quotation omitted)). While Plaintiff points out that he has taken a nuclear stress test, he has not pointed to any medical evidence in the record, such as the opinion of a treatment provider, that an exercise test would present a significant risk to him.

Based on the foregoing, the Court concludes that Plaintiff has not met his burden to show that his chronic heart failure equals Listing 4.02, and the ALJ did not err at step three.

### C. Step Four: Residual Functional Capacity

At step four, the ALJ determines a claimant's residual functional capacity. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy*, 648 F.3d at 614 ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the [residual functional capacity]." *Id.*; *see also Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013)

("The Commissioner must determine a claimant's [residual functional capacity] based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations."). "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c). And, "[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016).

The ALJ determined Plaintiff was capable of performing sedentary, unskilled work[13] with the following additional limitations:

> limited to lifting and carrying 10 pounds occasionally, less than 10 pounds frequently; standing and/or walking two hours out of an eight-hour workday, sitting for six hours in an eight-hour workday; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, kneeling, crouching, crawling; no work with exposure to unprotected heights or moving mechanical parts; no exposure to humidity and wetness; no concentrated exposure to dust, odors, fumes, and pulmonary irritants; no concentrated exposure to extreme cold or extreme heat, or vibration; limited to simple, routine, and repetitive tasks; [and] brief, superficial and occasional interaction with supervisors, coworkers and the public.

Tr. 30-31; *see* Tr. 30-32, 40.

---

[13] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is one which involves sitting, a certain amount of walking and standing is often necessary to carry out job duties." 20 C.F.R. § 404.1567(a). "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

Again affording Plaintiff's submissions a liberal construction, Plaintiff challenges the weight assigned to the opinions of his treating psychiatrists; the combined effects of his mental and physical impairments; and the conclusion he is able to remain on task and maintain attendance consistent with competitive standards. Pl.'s Mem. at 3; Compl. at 2.

### 1. Opinions of Treating Psychiatrists

David Eric Adson, MD, treated Plaintiff between January 2017 and March 2018 for bipolar disorder and generalized anxiety disorder. *See, e.g.*, Tr. 294-97, 307-08, 493-96, 519-23, 539-47. In early January 2017, Dr. Adson noted that Plaintiff "clearly has significant impairment and due to ongoing significant symptoms including cognitive impairment I don't think he will be able to return to gainful employment." Tr. 297; *accord* Tr. 494 (repeating assessment from 1/5/17 visit). At the end of January 2018, however, Dr. Adson noted that Plaintiff "would benefit from working." Tr. 541. During Plaintiff's next appointment in early March 2018, Dr. Adson noted that while Plaintiff's disability application was "pending, . . . he may just return to work; now on job search in earnest." Tr. 545.

Plaintiff's care was transitioned to William Henry Meller, MD, in April 2018. Tr. 548 ("referred by Dr. Adson as a transfer patient for ongoing care"). Plaintiff reported that his "mood has been 'good' and relatively stable." Tr. 550; *see* Tr. 548. Plaintiff's "[a]nxiety level often fluctuate[d], but has been overall manageable." Tr. 550; *see* Tr. 550. Dr. Meller adjusted Plaintiff's Seroquel[14] dose due to Plaintiff experiencing

---

[14] Seroquel is a brand name for quetiapine, which is used "to treat episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder"; "prevent episodes of mania or depression in patients with bipolar disorder"; and "treat depression." *Quetiapine*, MedlinePlus, U.S. Nat'l Lib. of Med., https://

"excessive morning sedation and feeling 'hung over'" and directed him to return in three months.  Tr. 550-51.

At his next appointment in early September 2018, Plaintiff was anxious and depressed with "intermittent psychotic symptoms."  Tr. 568.  In particular, Plaintiff was "worried that he may not get his Social Security disability."  Tr. 567.  Plaintiff did not feel was he was "ready to go back to work."  Tr. 567.  Dr. Meller noted that he "agree[d] with [Plaintiff]."  Tr. 567.  Dr. Meller wrote: "I actually do agree with him, he is not ready to go back to work, he simply has too much mood instability along with his very poor cardiac condition."  Tr. 567; *see* Tr. 568 ("I also agree with the patient that he really is unable to return to work at least not at this point in his life.  He has very significant anxiety, mood l[a]bility and mild psychotic symptoms on top of heart failure with a significant decrease in ejection fraction.").

The ALJ gave the opinions of Drs. Adson and Meller "little weight" when determining Plaintiff's residual functional capacity.  Tr. 39.  The ALJ found that both opinions were "conclusory" and "on an issue reserved to the Commissioner in these proceedings."  Tr. 39.  The ALJ also found that these opinions were "not consistent with the record as a whole and [Plaintiff's] course of care, which reflects waxing and waning mental health symptoms, but generally benign mental status examination findings."  Tr. 39.

Plaintiff asserts that the ALJ disregarded his psychiatrists' recommendations not to work, Compl. at 2, which the Court interprets as a challenge to the weight the ALJ

---

medlineplus.gov/druginfo/meds/a698019 html (last accessed Sept. 17, 2021).

assigned to their opinions. Although Drs. Adson and Meller each indicated at different points in time that Plaintiff was unable able to work, the ALJ correctly observed that these opinions were on an issue that is ultimately reserved to the Commissioner and thus "inherently neither valuable nor persuasive to the issue of whether [Plaintiff is] disabled." 20 C.F.R. § 404.1520b(c); *see* 20 C.F.R. § 404.1520b(c)(3)(i) ("[s]tatements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work"); *see also Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight.").

The ALJ also properly took into account the opinions' supportability and consistency with other evidence in the record. *See* 20 C.F.R. §§ 404.1520c(c)(1) ("The more relevant objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical findings will be."), (2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

The ALJ chronicled Plaintiff's course of treatment with Drs. Adson and Meller as well as other mental-health professionals. Tr. 34-37. The ALJ recognized that Plaintiff was hospitalized for a period of time in July 2016 after his wife "brought him to the

24

emergency room where he was admitted with a diagnosis of acute mania." Tr. 35; *see generally* Tr. 325-345. The ALJ observed that "[n]otes from the hospitalization indicate [Plaintiff] presented with labile and inappropriate affect, rapid and pressured, tangential speech, and that he was agitated and actively hallucinat[ing], but not hyperactive or combative. His thought content was paranoid and he expressed impulsivity and inappropriate judgment as well as inattention." Tr. 35; *see, e.g.*, Tr. 325, 327-28, 330-31, 337-41, 343-45. The ALJ correctly observed, however, that Plaintiff "improved while hospitalized," and his "mania symptoms had 'pretty much resolved' per notes by Dr. Adson [by mid-August 2016], although [Plaintiff] reported some ongoing difficulties with sleep." Tr. 35; *see, e.g.*, Tr. 343-44, 307.

The ALJ also accurately described Plaintiff's course of care apart from his hospitalization, noting that the record "reflects waxing and waning mental health symptoms, but generally benign mental status examination findings." Tr. 39. Plaintiff attended therapy with Emily H. A. Everhart, LICSW, approximately once per month between May and September 2016. Tr. 360-61, 357, 353-55, 347-48, 313-14, 300-01. Plaintiff's mood was regularly anxious. Tr. 360, 357, 353-55, 313-14, 300-01. While Plaintiff's affect was occasionally subdued and worrisome, it was more often noted to be appropriate. *Compare* Tr. 360, 353-55 *with* Tr. 357, 347-48, 313-4, 300-01. Similarly, while Plaintiff's thought content occasionally reflected rumination, it was most often clear. *Compare* Tr. 360, 353-55 *with* Tr. 357, 347-48, 313-14, 300-01. Consistently, Plaintiff's appearance was noted to be appropriate; he made good eye contact; his speech was normal; his thoughts were coherent and logical; and his insight was good. Tr. 360,

357, 353-55, 347-48, 313-14, 300-01. In the beginning of August 2016, Plaintiff reported that he was "starting to feel better" following his hospitalization, experiencing "decreased worry and more balanced perspective." Tr. 313. Plaintiff also reported that his "medication changes have been helpful." Tr. 313. At his next session in September, he continued to report that he was doing better and felt the "medication changes . . . have been very helpful." Tr. 301. Although Plaintiff "continue[d] to have numerous worries," his "current medications [we]re making a significant difference in how he is managing those worries." Tr. 301.

Between April and October 2017, Plaintiff continued monthly therapy with Lee S. Shuster, LICSW.[15] Tr. 480-88, 506-08, 528-32; *see also* Tr. 510-12. Initially, Plaintiff "discussed how down he ha[d] been" and a "lack of motivation." Tr. 486. In June and July, Plaintiff was "feeling better and getting more done around the house." Tr. 481; *see* Tr. 507. Shuster offered to meet with Plaintiff more frequently, especially as he was working on his sobriety, but he declined. Tr. 529. Again, Plaintiff's mood was regularly noted to be anxious. Tr. 486-87, 483-85, 480-82, 506-08, 528-29, 533-35. At the same time, Plaintiff's appearance was consistently appropriate; he maintained good eye contact; his speech was normal; his affect was appropriate; his thoughts were clear and logical; and his insight was good. Tr. 486-87, 483-85, 480-82, 506-08, 528-29, 533-35. In October, Plaintiff reported "he ha[d] been sober for the past month and [wa]s feeling much better." Tr. 534. Plaintiff and his wife had recently joined a church and he thought

---

[15] The ALJ erroneously attributed Shuster's treatment notes to Everhart. Tr. 36 (referring to 2017 treatment notes from "Everhart"); *see* Tr. 299 (September 2016 treatment note from Everhart indicating Plaintiff's care would need to be transferred as she was leaving the facility).

it would "give him the opportunity to get involved in things." Tr. 534. Plaintiff had also been "going to his youngest son's school to help with lunches." Tr. 534. Shuster noted that Plaintiff "demonstrated more insight and more of an openness to discuss is [sic] situation." Tr. 534. Shuster again "offered to see [Plaintiff] more often than monthly and [he] declined." Tr. 534.

At the end of June 2018, Plaintiff had a session with another licensed clinical social worker and was "planning to restart with his outpatient mental health therapist." Tr. 563-66. Plaintiff reported having a "more stable mood" and was "considering gaining employment but ha[d] a fear of how he will function due to his mental health and physical medical issues." Tr. 564. Plaintiff's mood was noted to be normal. Tr. 565.

In October 2018, Plaintiff met with a licensed psychologist. Tr. 580-87. Plaintiff "[f]e[lt] clear and stable" and was "seeking therapy at this time as need for support." Tr. 581. Plaintiff's mood was likewise noted to be normal. Tr. 584.

The ALJ took into account the appropriate factors when determining the weight to assign to the opinions of Drs. Adson and Meller, and the Court concludes there is substantial evidence in the record to support the ALJ's evaluation of this opinion evidence.

### 2. Combined Effects of Impairments

Plaintiff also asserts that the ALJ "did not consider [the] combination of [his] physical [and] mental illnesses as a whole (Legg Perthes disease,[16] heart disease, mental illness)." Compl. at 2.

The ALJ found Plaintiff to have the severe impairments of "chronic congestive heart failure; chronic ischemic heart disease; pulmonary hypertension; left hip arthritis, Legg-Calvé-Perthes disease; bipolar disorder type I with intermittent psychotic symptoms; and generalized anxiety disorder." Tr. 25  The ALJ discussed the evidence in the record regarding Plaintiff's heart conditions, mental health, and hip condition when determining Plaintiff's residual functional capacity, including Plaintiff's description of his symptoms, his daily activities, the medical records, and the opinion evidence. Tr. 31-39.  The ALJ explained that Plaintiff "is limited to sedentary work with additional postural, climbing, and environmental restrictions, to accommodate his heart impairments and his hip arthritis." Tr. 32.  In fact, the ALJ gave only "partial weight" to the opinions "of the state agency medical consultants, who found [that Plaintiff] could perform light work, based on [Plaintiff's] ongoing symptoms and treatment throughout the relevant time period, including the diagnosis of osteoarthritis of the left hip." Tr. 38.  The ALJ additionally explained that Plaintiff "is further limited mentally in terms of complexity of tasks, and socially, to accommodate his mental health impairments and symptoms." Tr. 32.

---

[16] "Legg-Calvé-Perthes disease is a bone disorder that affects the hips." *Legg-Calvé-Perthes disease*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/genetics/condition/legg-calve-perthes-disease/ (last accessed Sept. 17, 2021).  "Many people with Legg-Calvé-Perthes disease go on to develop a painful joint disorder called osteoarthritis in the hips at an early age." *Id.*

The Court appreciates that Plaintiff is proceeding pro se. Plaintiff has not, however, articulated to the Court what in particular about the combination of his heart, mental-health, and hip conditions the ALJ failed to consider or what additional limitations should have been included in his residual functional capacity as a result of his combined impairments. "[I]n granting the deference owed to pro se parties, [the Court may not] assume the role of advocate for the pro se litigant." *Machen v. Iverson*, No. 11-cv-1557 (DWF/JSM), 2012 WL 566977, at \*15 (D. Minn. Jan. 23, 2012), *report and recommendation adopted*, 2012 WL 567128 (D. Minn. Feb. 21, 2012).

### 3. Ability to Stay on Task & Absenteeism Due to Treatment

Plaintiff asserts that he is not able to sustain full-time employment due to being off task and the inability to maintain regular attendance on account of his impairments and treatment. Pl.'s Mem. at 3.

Assessment of a claimant's residual functional capacity requires consideration of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at \*7 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-8p] (footnote omitted). The Eighth Circuit has stated that a claimant's residual functional capacity "must be based on . . . [his] ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy*, 648 F.3d at 617 (quotation omitted).

### a. Ability to Stay on Task

Plaintiff asserts he "*will not* be able to perform *any job* on a consistent basis, or at least not without . . . time being off task that will be inconsistent with *any* competitive job." Pl.'s Mem. at 3. At the hearing, the vocational expert testified that someone who was "off-task 10 percent or more" beyond the standard approved breaks would not be employable "at the unskilled occupational base." Tr. 84.

As stated above, the ALJ limited Plaintiff "to simple, routine, and repetitive tasks" and "brief, superficial and occasional interaction with supervisors, coworkers[,] and the public." Tr. 31. The ALJ explained that these limitations, "in terms of complexity of tasks, and socially, [were] to accommodate [Plaintiff's] mental health impairments and symptoms." Tr. 32. In reaching this residual-functional-capacity determination, the ALJ considered Plaintiff own descriptions of his symptoms and limitations, his daily activities, the findings of his mental-health treatment providers, and the opinions of the state agency psychological consultants. *See* Tr. 28-29, 34-38.

The ALJ noted that Plaintiff indicated in his function report that "he can pay attention for 5-15 minutes"; has "difficulties with memory, completing tasks, concentration, understanding and following instructions"; "usually needs reminders to follow spoken instructions, or for the instructions to be repeated"; and has "difficulty handling stress and changes in routine." Tr. 28, 30; *see* Tr. 234-35.

The ALJ observed that, on mental status examinations, Plaintiff was noted to have "impaired attention span and concentration," but "this was not specified." Tr. 28, 29; *see, e.g.*, Tr. 296 ("Attention Span and concentration: impaired"); *see also, e.g.*, Tr. 495, 522,

541, 546, 558.  *But see* Tr. 308 ("attention span and concentration are intact"), 551 (concentration "within normal limits"), 568 (concentration "at baseline").  Outside of his period of hospitalization, Plaintiff generally had "no evidence of abnormal thought content."  Tr. 28, 29; *compare, e.g.*, Tr. 296, 301, 308, 314, 348, 358, 481-82, 485, 495, 511, 522, 530, 535, 541, 546, 550, 551, 558, 566, 584 *with* Tr. 324-45.  Plaintiff was also fully oriented with "intact short-term and long-term memory, fluent language, average intelligence and fund of knowledge, as well as normal abstraction."  Tr. 28, 29; *see, e.g.*, Tr. 296, 301, 308, 314, 348, 355, 358, 360, 481, 484, 495, 511, 522, 530, 535, 541, 546, 550, 551, 558, 565-66, 568, 584.

The ALJ recognized that Plaintiff "was in a particularly stressful job at the time of the alleged onset date" and "reported his symptoms had resulted in functional limitations in managing the household and completing tasks, self-care, and work responsibilities."  Tr. 37-38.  The ALJ also recognized that, once Plaintiff was no longer in that position, the evidence in the record reflected that he "felt much better and was able to do much more than he used to."  Tr. 38.  The ALJ noted that Plaintiff was "able to drive, manage personal care and household chores, and care for his children."  Tr. 28; *see also* Tr. 29, 37.  The ALJ further noted that Plaintiff "expressed an interest in returning to work" and, at one point, "was on a job search in earnest."  Tr. 38.

Lastly, the ALJ gave great weight to the opinions of the state agency psychological consultants.  Tr. 38.  They opined that Plaintiff "has the mental capacity to understand, remember, and follow simple instructions" and should be "restricted to work that involves brief, superficial interactions [with] fellow workers and the public."  Tr. 98;

31

*see* Tr. 114. "Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, [they opined Plaintiff] is able to sustain attention and concentration skills to carry out work[-]like tasks with reasonable persistence and pace." Tr. 98; *see* Tr. 114.

In sum, the ALJ considered all of the relevant evidence in assessing Plaintiff's residual functional capacity and the limitations attributable to his mental impairments. *See Myers*, 721 F.3d at 527; *Perks*, 687 F.3d at 1092. It is not the role of this Court to reweigh the evidence. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007); *see also Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014). There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff had the residual functional capacity to remain on task within customary tolerances for jobs involving "simple, routine, and repetitive tasks" and "brief, superficial and occasional interaction with supervisors, coworkers[,] and the public." Tr. 31.

### b. Absenteeism Due to Treatment

One of the considerations in assessing a claimant's residual functional capacity is "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p, 1996 WL 374184, at *5. "[A]bsenteeism from work resulting from a [claimant's] need for treatment may constitute evidence that such [claimant] is unable to perform work activity on a regular and continuing basis or on an equivalent schedule." *Gordon v. Saul*, No. 8:18-829-T-SPF, 2019 WL 4254470, at *3 (M.D. Fla. Sept. 9, 2019). When excessive absenteeism is caused by a claimant's impairment(s), a

claimant "is entitled to have it considered by the vocational expert." *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998).

Plaintiff asserts that he is not able to maintain the attendance standards of competitive employment. Plaintiff asserts that he has "several doctor's appointments per month that would amount to a minimum of 3 days absence and up to one week during 'episodes' pertaining to [his] heart and/or mental illness would allow [him] zero additional 'sick' days compared to other employees." Ltr. to ALJ at 2. Plaintiff's medical records show, for example, that he had medical appointments related to his heart and mental-health impairments on at least 35 days in the approximately 18-month period between February 2016 and July 2017, including the five-day hospitalization in July 2016. *See, e.g.*, Tr. 281-398, 480-96, 505-11. The Commissioner responds that "nothing in the record indicates that Plaintiff could not arrange his medical appointments around his work schedule." Comm'r's Mem. at 17.

In response to the ALJ's question at the hearing regarding how many absences would be tolerated for unskilled work, the vocational expert testified:

> Barring any prearranged accommodative understanding, your honor, in the unskilled occupational base if a person were to be absent once or twice a month, to say two to possibly three consecutive months, depending on the employer that person would be let go since typically there's a probationary period in the unskilled occupational base ranging from 39 to 90 days in which attendance, punctuality, and other factors are extremely important in order a [sic] person to maintain and sustain employment.

Tr. 84.

In essence, Plaintiff is arguing that the frequency of his medical appointments renders him disabled. Respectfully, "if this Court were to adopt Plaintiff's argument, then any [claimant] could establish disability simply by scheduling monthly doctor's appointments." *Jefferies v. Berryhill*, No. 4:16 CV 18 JMB, 2017 WL 365439, at *6 n.5 (E.D. Mo. Jan. 25, 2015); *see Barnett v. Apfel*, 231 F.3d 687, 691 (8th Cir. 2000) (argument based on "extrapolation of how many days [claimant] must have missed from work based on her medical record is faulty . . . in that it assumes she was required to miss entire days of work for each appointment"); *see, e.g.*, *Brown v. Comm'r of Soc. Sec.*, No. 18-CV-3071-LTS-KEM, 2020 WL 3120350, at *7 (N.D. Ia. Feb. 25, 2020) (citing cases rejecting argument that number of medical appointments per month equates to number of days of work missed per month), *report and recommendation adopted sub nom.*, *Brown v. Saul*, No. C18-3071-LTS, 2020 WL 1467044 (N.D. Ia. Mar. 26, 2020) [hereinafter *Brown II*].

This is not a case in which Plaintiff has pointed to opinion evidence that he is likely to be absent a number of days per month due to his impairments or treatment. *See, e.g.*, *Miller v. Saul*, No. 4:19 CV 1693 DDN, 2020 WL 5994526, at *5 (E.D. Mo. Oct. 9, 2020); *cf.*, *e.g.*, *Ross v. Apfel*, 218 F.3d 844, 848-50 (8th Cir. 2000); *Baker*, 159 F.3d at 1146; *Barbara M. v. Saul*, No. 18-cv-1749 (TNL), 2019 WL 4740093, at *13-14 (D. Minn. Sept. 26, 2019). Nor is this a case where it is uncontested that Plaintiff's treatment would cause him to be absent for the entire day. *Cf.*, *e.g.*, *Kim J. H. v. Saul*, No. 18-cv-2736 (MJD/TNL), 2020 WL 872308, at *9-11 (D. Minn. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 869963 (D. Minn. Feb. 20, 2020); *see also*

*Shoemaker v. Saul*, No. 1:19CV441, 2020 WL 5117992, at *6 (M.D. N.C. Aug. 31, 2020) ("In this case, Plaintiff has presented uncontested evidence—through her testimony, the medical records of her treating physician Dr. Kishnani, and the medical records of her infusions—that treatment of her Gaucher disease requires infusions every 2 weeks, with appointments generally lasting 3 to 5 hours.").

"[S]imply because a claimant requires regular healthcare appointments does not necessarily mean he cannot work on the days he has appointments, such as by arranging appointments around the work schedule or during breaks, nor even that the claimant would need to miss an entire work day for an appointment." *Morin v. Colvin*, No. 4:14-CV-000769-NKL, 2015 WL 4928461, at *9 (W.D. Mo. Aug. 18, 2015). It is Plaintiff's "burden to show the frequency of his healthcare appointments and any disruption they would cause." *Id.* At best, Plaintiff's medical records show "how many times []he has visited a doctor." *Jefferies*, 2017 WL 365439, at *6. Plaintiff has not, however, shown that each medical appointment "would result in [him] missing an entire day of work." *Id.*; *see, e.g.*, *Barnett*, 231 F.3d at 691; *Penney v. Berryhill*, No. 16-CV-2097-LRR, 2017 WL 3301228, at *8 (N.D. Ia. July 11, 2017), *report and recommendation adopted*, 2017 WL 3299392 (N.D. Ia. Aug. 2, 2017); *Morin*, 2015 WL 4928461, at *9-10. "If [Plaintiff] contends his medical appointment would necessarily conflict with a work schedule, it is his burden to demonstrate that." *Brown II*, 2020 WL 1467044, at *9. Plaintiff has not met his burden to prove that the ALJ erred by not including a limitation for absenteeism.

### D. Other Issues

Plaintiff's submissions can be construed as raising three additional arguments, which the Court addresses in turn. First, Plaintiff asserts that his prior counsel "did not file all relevant documents before [the] hearing." Compl. at 2. But, Plaintiff has not identified what these "relevant documents" were and how they would have impacted the ALJ's decision. Second, Plaintiff asserts that his father, with whom Plaintiff worked for 14 years, "was not permitted to be in the original interview [and] had much to share." Compl. at 2. As best as this Court is able to tell, this has to do with the initial-determination process. *See* Tr. 208-09. The ALJ was not, however, bound by the prior determinations. *See* 20 C.F.R. § 404.1503(d). There is no indication that Plaintiff attempted to have his father testify at the hearing or present relevant information to the ALJ through a written statement or other means. *See* 20 C.F.R. § 404.1512(a) (claimant's responsibility to provide evidence "is ongoing" and "applies at each level of the administrative review process"). Lastly, Plaintiff states that he has been hospitalized two additional times "since these decisions for clinical depression [and] psychosis." Compl. at 2. While the Court has no reason to doubt the accuracy of this statement, Plaintiff has not presented evidence of these hospitalizations and, in particular, has not articulated how these hospitalizations, which post-date the ALJ's decision, are probative of Plaintiff's mental impairments on or before the date of the ALJ's decision.

### E. Final Remarks

In closing, it is not lost on this Court the very real and deeply personal emotional and financial toll the denial of benefits has wrought on Plaintiff and his family. The

Court has received two heartfelt letters from Plaintiff's father.  *See generally* ECF Nos. 19, 26.  It bears repeating that it is not the role of this Court to reweigh the evidence. *Cline*, 771 F.3d at 1102; *Cox*, 495 F.3d at 617.  A reviewing court "will disturb the ALJ's decision only if it falls outside the available zone of choice."  *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (quotation omitted).  And, "[a]n ALJ's decision is not outside the zone of choice simply because [the reviewing court] might have reached a different conclusion had [it] been the initial finder of fact."  *Id.* (quotation omitted); *see Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (reviewing court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion").  As stated above, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.  It is not, however, inconsistent with the Court's role and obligations to empathize with Plaintiff's difficult situation and wish Plaintiff well going forward.  If he has not done so already, the Court encourages Plaintiff to consult with an attorney or legal aid organization about the possibility of reapplication.

## IV. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement, ECF No. 22, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 23, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September____29____, 2021

_____*s/ Tony N. Leung*_____
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*Jason P. P. v. Kijakazi*
Case No. 20-cv-688 (TNL)

38